Filed 5/11/16  Dell Canon Investments v. Gabai CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DELL CANON INVESTMENTS, LLC, et al., | B259752 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC479241) |
| v. | |
| MORAD GABAI et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Susan Bryant-Deason, Judge; Bobbi Tillmon, Judge.  Affirmed.

Vakili & Leus, Sa'id Vakili, Robert M. Zabb and John A. Schlaff for Plaintiff and Appellant Michael Rostami, M.D.

Caldwell Law Group and Susan L. Caldwell for Plaintiffs and Appellants Dell Canon Investments, LLC and Mahnaz Rashti.

Shafron & Kammer, Shelly Jay Shafron, Kevin David Kammer and Douglas G. Carroll, for Defendants and Respondents.

_____

Plaintiff Dell Canon Investments, LLC, and its two owners – Mahnaz Rashti and Michael Rostami – appeal from the judgment in favor of four individual defendants in Dell Canon's action to enforce a commercial loan guarantee. Appellants contend there was insufficient evidence to support the judgment, that instructional error occurred, that jury misconduct occurred, and that the trial court erred by awarding attorney's fees against Rashti and Rostami. We reject these contentions and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

In June 2007, Califa Street, LLC, obtained a $2.1 million loan from All Century, Inc., to fund the purchase and development of land in Van Nuys.[1] This action arises from the purported guarantee of that loan signed by the four members of Califa Street: defendants Bahman Kianmahd, Kambash Hakimian, Javid Tehranzadeh, and Morad Gabai.[2]

The owner of lender All Century was Joseph Boodaie, a respected and trusted member of the Persian community, to which defendants belonged. Although Boodaie wanted defendants to personally guarantee the Califa Street loan, Kianmahd told him that the defendants would not agree to do so. Boodaie told Kianmahd that he would not require their personal guarantees, and Kianmahd conveyed this to his partners.

When the defendants arrived at Boodaie's office to sign the loan documents, they were presented with both a note and a guarantee to sign. Because the structure of these documents is critical to our decision, we describe them in some detail.

The text of the note refers to an unidentified "maker" (borrower) until the last page, where it states: "MAKER: [¶] CALIFA STREET, LLC." Underneath that are four signature lines, one for each defendant, with the word "BORROWER" directly

---

[1] For ease of reference, we have rounded the various sums at issue in this case.

[2] We will refer to the these four parties either individually by their last names or collectively as "defendants." We refer to Califa Street, LLC, as "Califa." Califa was not a party to the litigation.

2

beneath each line, followed by the defendants' names. The defendants also initialed each page of the note.

The guarantee begins by stating that it is being executed by "Califa Street, LLC," and throughout the text refers to the obligations of "the guarantor" without further identification. As with the note, the defendants initialed each page of the guarantee. On the last page, there are signature lines for each defendant. Several spaces above each signature line is the term "Guarantor."

The defendants did not read the documents thoroughly, but, based on Boodaie's promise that there would be no personal guarantee of the Califa Street loan, believed that the identification of Califa Street as the guarantor at the start of that document was consistent with Boodaie's assurances. Boodaie believed that he had added the defendants as both borrowers and guarantors in order to have a means of pursuing any deficiency should he ever foreclose on the property due to default.

Califa Street never made any payments on the loan because the deal soured during the 2008 economic downturn. Many of All Century's loans were funded through Boodaie's revolving $5 million line of credit with Comerica Bank. When Boodaie defaulted on that loan, Comerica took a bundle of loans funded by Boodaie that it held as collateral, including the Califa Street loan and guarantee. In 2011, Comerica sold that package of notes to Dell Canon Investments, LLC, for $1.17 million. Dell Canon foreclosed on the Califa Street property and recovered net proceeds of $870,000, The owners of Dell Canon are appellants Mahnaz Rashti and her brother, Michael Rostami.[3]

One key issue at trial was whether Dell Canon was prevented from recovering a deficiency judgment. The trial court ruled that Article 9 of the Commercial Code –

---

[3] Dell Canon and Rashti on the one hand and Rostami on the other are represented by different counsel on appeal and filed separate appellate briefs. Rostami's brief is limited to the issue of attorney's fees, but he has joined in the arguments raised by Dell Canon and Rashti, which deal with all the issues raised on appeal. Dell Canon and Rashti have not joined in Rostami's arguments, however. We will refer to these three parties collectively as appellants.

governing secured transactions – applied, allowing Dell Canon to recover a deficiency judgment if it prevailed. Even so, questions lingered as to whether Dell Canon's recovery remained limited because it held no more than a security interest in the note. As a result, Rashti and Rostami asked on the eve of trial to be added as plaintiffs in order to seek recovery of a deficiency judgment as judgment creditors of Boodaie and All Century. Defendants stipulated to that request, which the trial court granted. Two weeks later, while the trial was still underway, defendants were granted a nonsuit as to Rashti and Rostami.[4]

Dell Canon's trial theory was straightforward: Boodaie never promised to excuse defendants from serving as guarantors of the Califa Street note, and defendants were bound by the agreement despite their admitted failures to read it in full. The defense advanced two primary theories: (1) they were fraudulently induced to sign the guarantee based on Boodaie's assurances that he would not require their personal guarantees, with their reliance justified by the guarantee's page one identification of Califa Street as the lone guarantor; and (2) based on Boodaie's testimony that he intended to make defendants both borrowers and guarantors, the purported guarantee was illusory because a debtor cannot guarantee his own debt.

In addition to instructions concerning fraud and contract interpretation, the jury was instructed that Dell Canon had to prove the essential elements of contract formation: clear terms; the exchange of something of value (consideration); and that they agreed to the contract terms. The jury was not given separate instructions on offer and acceptance, however.

The special verdict form began by asking the jury to determine whether the defendants "sign[ed] and enter[ed] into a contract with All Century, Inc., by which they individually guaranteed payment of the Califa Street [note]." A finding that they had not would end the case in defendants' favor. A finding that they had would allow the jury to

---

**4** We do not have to examine the complexities of the Commercial Code in any detail. It is enough to note that Rashti and Rostami were briefly added as plaintiffs in order to protect their right to recover a deficiency judgment under an alternate theory.

continue on to numerous additional verdict questions concerning performance and breach of the guarantee, and whether defendants were defrauded into signing the guarantee. The jury answered the first question no, resulting in a verdict for defendants.

Dell Canon moved for a new trial, primarily on the ground of juror misconduct. This contention was supported by the declarations of three jurors that some jurors: introduced their own supposed knowledge of the law into the deliberations; were biased against Rashti and Rostami because of their wealth; fed the jury evidence of Boodaie's bad character; reached their verdict by way of a compromise, at least in part because the foreman was supposed to leave on vacation; and misunderstood the law, making the verdict against the law. Dell Canon also argued that the trial court erred by instructing the jury on contract formation after finding that contract formation was not at issue, and by not instructing the jury on offer and acceptance along with the contract formation instruction.

Defendants objected to nearly all of Dell Canon's jury misconduct declarations, and those objections were sustained. Defendants also submitted a declaration from the jury foreman and another juror that rebutted the remaining misconduct contentions. After weighing the evidence, the trial court found that Dell Canon had not carried its burden of proving that misconduct occurred and therefore denied the new trial motion.

Defendants moved to recover attorney's fees of $463,000 and assorted costs of $29,000 pursuant to the attorney's fee provision in the guarantee. Defendants also sought to hold Rashti and Rostami jointly and severally liable for those fees under several theories, including their alleged status as the alter egos of Dell Canon. Evidence from the motion and from Rashti's trial testimony revealed the following: Dell Canon was formed by Rashti and Rostami for the sole purpose of buying All Century's bundle of notes from Comerica; they never had corporate meetings, took minutes, or otherwise observed the usual corporate formalities; it was unclear whether Dell Canon had its own bank accounts; in any event, all the funds for operating Dell Canon came from Rostami's personal business account; the fees of the lawyer who handled Dell Canon's daily operations and who represented appellants in this action until at least sometime in 2013

5

came from Rostami's business account; Dell Canon paid $1.17 million for the All Century notes but recouped less than $1.3 million by foreclosing on three of those properties, leaving it with only one property – a piece of raw land in the Arizona desert that Rashti testified was worthless. The $800,000 recouped from foreclosing on Califa Street went to Rostami.

Dell Canon's opposition to defendant's attorney's fee motion did not address the alter ego issue. After taxing more than $10,000 in claimed costs, the trial court awarded defendants' attorney's fees and costs of $465,000 dollars, and made that award joint and several as to Dell Canon, Rashti, and Rostami. The court's minute order states only that it did so for the reasons set forth in defendants' moving papers, and the record does not include a transcript of that hearing.

## DISCUSSION

1. *The Verdict is Supported by Substantial Evidence*

The judgment for defendants was based on the jury's negative finding in response to special verdict question No. 1, which asked whether defendants "sign[ed] and enter[ed] into a contract with All Century, Inc. by which they individually guaranteed payment of the Califa Street [note]." Appellants characterize this verdict question as targeted to contract formation issues of offer and acceptance, and contend there was no substantial evidence to support the jury's finding because it was undisputed that defendants had signed and entered the agreement to guarantee the note.

Appellants' contention ignores the other contract formation issue as to which the jury was instructed: whether there was consideration to support the guarantee agreement. We begin with the "sham guarantee" doctrine: that a borrower cannot guarantee his own debt, and that such a purported agreement is illusory and therefore lacking consideration. (*Steiner v. Thexton* (2010) 48 Cal.4th 411, 423 [an illusory promise lacks consideration]; *Dole Food Co., Inc. v. Superior Court* (2015) 242 Cal.App.4th 894, 911 [doing what one is already legally bound to do cannot be consideration for a promise]; *River Bank*

6

*America v. Diller* (1995) 38 Cal.App.4th 1400, 1423; *Torrey Pines Bank v. Hoffman* (1991) 231 Cal.App.3d 308, 319-320 [principal loan obligor's guarantee adds nothing to the loan obligation].)

The jury was instructed that defendants claimed Califa Street had guaranteed its own debt  It was also instructed with a form instruction (CACI No. 302) on the elements of contract formation:  (1) that the contract terms had to be clear; (2) "[t]hat the parties agreed to give each other something of value [a promise to do something or not do something may have value]"; and (3) that the parties agreed to the contract terms.

By focusing on a limited portion of special verdict question No. 1 – whether defendants signed and entered the guarantee agreement – appellants have ignored the question's qualifying descriptor:  whether defendants signed and entered "a contract . . . by which they individually guaranteed" the Califa Street note.  If the jury concluded that the guarantee was effective as to Califa Street only, and not defendants, then it could also find that the guarantee was illusory and lacked consideration.  We believe such a finding is supported by substantial evidence.  (*Canister v. Emergency Ambulance Service, Inc.* (2008) 160 Cal.App.4th 388, 394 [under substantial evidence rule we view the evidence most favorably to the prevailing party, and indulge in all legitimate and reasonable inferences to resolve any evidentiary conflicts to uphold the verdict].)

The first line of the guarantee identifies only Califa Street as the guarantor. Paragraph D. of the contract recitals states that the "*Borrower* is, concurrently herewith, executing" certain instruments:  the note, deed of trust, *the guarantee agreement*, and something called environmental indemnity.  (Italics added.)  In short, the guarantee identified Califa Street as the guarantor, while at the same time stating that the borrower – Califa Street – was executing the guarantee.  Based on this the jury could conclude, as defendants testified, that the guarantee was effective as to only Califa Street and that they were signing only on behalf of the LLC.  As a result, the guarantee would be illusory and without consideration.  (*Louisville Title Ins. Co. v. Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 791 [in jury trial, existence of consideration was a question of fact];

7

*Walsh v. Parker* (1940) 41 Cal.App.2d 435, 443 [existence of consideration was question of fact for jury].)

Alternatively, the verdict question is so broadly worded that it could be seen as encompassing defendants' fraud in the inducement theory based on Boodaie's assurances that there would be no personal guaranty. The jury might well have concluded that it was being asked to reach that issue as well, where they were asked whether defendants agreed to individually guarantee the Califa Street note. If the jury believed defendants' version of events, it could have found that Boodaie gave such an assurance, and, combined with the contract terms just described, misled defendants to reasonably conclude that they were signing on behalf of Califa Street.

2.      *The Verdict Was Not Inconsistent*

Appellants also contend that the verdict was inconsistent because defendants' sole defense was fraud in the inducement, which is not a contract formation defense. This overlooks extensive discussion in the record concerning defendants' reliance on the sham guarantee defense, which relates to the contract formation element of consideration. During argument about how to instruct the jury on the definition of a guarantee, defense counsel raised the sham guarantee defense, based on the notion that Califa Street had guaranteed its own debt. Appellants' trial counsel acknowledged that the defense could be raised by way of a proper instruction. Defendants argued that theory to the jury without objection, at one point telling the jury that appellants had taken the risk of purchasing an illusory contract. As noted, the jury was instructed to determine whether there was consideration for the guarantee. Finally, during a discussion with the court concerning how to answer several jury questions, appellants' trial counsel acknowledged that special verdict question No. 1 concerned contract formation, stating that if the jury answered no to that question, then the result would be a defense verdict.

On this record we have no doubt that the contract formation element of consideration was squarely put before the jury, and that the verdict was not inconsistent.

8

3.      *Any Instructional Error Was Invited by Appellants*

Appellants contend the trial court erred by denying their new trial motion on the ground that instructional error occurred in three ways:  (1) by instructing the jury on contract formation (CACI No. 302) after declining to instruct on contract formation principles of offer and agreement/consent (CACI Nos. 307 & 309) because those matters were not at issue; (2) in response to a jury question asking for the definition of "consent," the trial court refused appellants' request for clarifying instructions, an error that was exacerbated by the trial court's refusal to instruct on principles of offer and contractual consent; and (3) by refusing to eliminate special verdict question No. 1.  The appellate record tells a different story.

First, both parties requested CACI No. 302 regarding the essential elements of a contract.  Second, it was *appellants'* trial counsel who objected to giving CACI Nos. 307 and 309 on offer and consent.  Third, both parties prepared the special verdict form and the record includes no objections to it by appellants.  Fourth, appellants' counsel did not ask for a clarifying instruction in regard to the jury's question about the definition of consent.  Instead, she urged the trial court to let the jury work its way through special verdict question No. 1.

Appellants contend that an unreported discussion with the trial court reflects their objections to these matters, but their failure to make a proper record for appellate review leaves us unable to evaluate their claims.  (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 678-679.)  As a result, we are left with a record that shows appellants either requested or acquiesced without objection to the instructions and special verdict question, leaving their claims of error barred under the invited error doctrine. (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000;  *Linder v. Cooley* (1963) 216 Cal.App.2d 390, 393-394.)

9

4.    *There Was Substantial Evidence that No Jury Misconduct Occurred*

A new trial may be granted on the ground that the jury committed misconduct. (Code Civ. Proc., § 657, subd. (2).)  Appellants moved for a new trial on this ground based on the declarations of their lawyer Susan Caldwell and three jurors – Umali, Nadohl, and Macasero – that jury foreman Landau and other jurors introduced extrinsic evidence and exhibited bias against appellants.  Appellants fail to address the trial court's order sustaining each of defendants' 58 written objections to those declarations.[5]  Because they do not challenge those evidentiary rulings, those issues are waived. (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 712, fn. 10. (*Mendoza*).)  As a result, we need only address the handful of accusations remaining in appellants' declarations in support of their new trial motion.

Distilled, the declarations in support of the new trial motion portray the following events.  The jury was originally deadlocked at 6-6 on question No. 1 of the special verdict form.  The next day, three jurors, including Nadohl, switched their votes to a "no" answer on that question.  Juror 5 and foreman Landau said they had vacations scheduled to begin the following day.  Other jurors said a verdict needed to be reached before then in order to avoid a mistrial.

Jury foreman Landau supposedly said that based on his experience as a real estate broker, All Century could not recover a deficiency judgment.  Landau also said that defendants could not consent to a contract that was not legal or invalid.  Landau also said during deliberations that Boodaie, the owner of original lender All Century, had a portfolio of loans and had defrauded investors through the same unethical practices that led to the collapse of the housing market in 2007-2008.  Landau supposedly said that Boodaie's unethical practices should not be rewarded, and that as a result defendants should not have to pay back the loan.  Landau and Juror No. 2 accused Rostami and Rashti of being greedy, said they could still recover money from the other notes in the

---

[5]    Appellants did not include the trial court's evidentiary rulings in its appellant's appendix.  Instead, it is contained in respondents' appendix.

10

bundle of loans they purchased from Comerica, and otherwise expressed bias against Rashti and Rostami due to their perceived wealth. Juror No. 2 referred to Rashti as a greedy bottom feeder who could go back to her million-dollar home. Landau and Juror No. 2 felt that defendants had lost enough through their $600,000 investment in Califa Street.[6]

In opposition to these declarations, defendants submitted the declarations of foreman Landau and Juror No. 2, named Katzer. Although appellants filed written objections to these declarations, the appellate record does not include the trial court's rulings, if any. Neither do appellants address that issue. As a result, any evidentiary challenges to the Katzer and Landau declarations are waived. (*Mendoza, supra,* 206 Cal.App.4th at p. 712, fn. 10.)

Katzer's declaration was brief, but denied any bias on her part and contended that her vote was based solely on the court's instructions and her evaluation of the evidence. Landau's declaration was lengthy and offered a point-by-point rebuttal or innocent explanation of the comments and conduct attributed to him.

Landau flatly denied stating that Boodaie had swindled investors, had a portfolio of loans, and engaged in conduct that caused the housing market to collapse. Landau was a real estate licensee, not a broker, and never said that, based on his knowledge as a broker, All Century could not recover a deficiency judgment. Juror Macasero and another juror accused defendants of perpetrating a scam by not paying back the loan. In response to that, Landau said any issues regarding the anti-deficiency laws had no bearing on whether the guarantee bound the defendants, and opined that that might be why the jury was not instructed on anti-deficiency principles.

Although Landau was one of two jurors with paid vacations looming, that did not affect his deliberations and he was at all times willing to continue deliberating if

---

[6]     Appellants' trial counsel, Susan Caldwell, also submitted a declaration attacking foreman Landau's conduct, including speculation that he had conducted an internet search about Boodaie. The trial court's evidentiary ruling regarding her declaration left nothing of substance concerning alleged jury misconduct.

11

necessary. There were no discussions about a mistrial, and he told the others that they should continue deliberating and wait to see what happened if a verdict could not be reached. The upcoming vacations of Landau and the other juror had no effect on the deliberations.

Landau never stated that the note's waiver of the anti-deficiency laws was illegal. He merely said that the term applied to the note, not the guarantee. Given the guarantee's uncertainty as to whom were the guarantors, Landau said that appellants had not carried their burden of showing a valid guarantee.

He did mention that the defendants had lost their $600,000 investment, but only in response to claims by other jurors that the defendants had lost nothing and should be penalized.

Although Juror No. 2 (Katzer) made general comments at the start of deliberations about the damage done by greedy lenders, her comments during deliberations focused solely on the evidence in light of the language of the guarantee. No other jurors expressed agreement with Katzer's remark. Landau replied that the jury should consider only the evidence before it, and nobody disagreed.

Katzer did not say that appellants could recover millions on the other notes they bought. Instead, she said that Rashti and Rostami must have made a calculation as to how much they could recover on the entire bundle of notes they bought from Comerica. Rashti's and Rostami's financial status was not a factor in the deliberations, and Landau did not recall comments to that effect.

With these competing declarations in mind, we turn to the law governing new trial motions. Appellants bore the burden of establishing that jury misconduct occurred. (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625 (*Donovan*).) Whether misconduct occurred requires evidence of overt acts or circumstances capable of corroboration by sight or sound that suggests a likelihood that one or more jurors were affected by bias or other improper considerations. (*Ibid.*) Jury misconduct may be shown by evidence of statements made, or conduct, conditions or events occurring, in or out of the jury room that are likely to have improperly influenced the verdict. However,

12

no evidence is admissible to show the actual effect of such statements or other matters upon a juror, or concerning the mental processes by which the verdict was reached. (Evid. Code, § 1150, subd. (a); *Donovan, supra,* at p. 625.)

In determining whether misconduct occurred, we accept the trial court's credibility determinations so long as they are supported by substantial evidence. (*Donovan, supra,* 167 Cal.App.4th at p. 624.)

Appellants have not adequately addressed the substantial evidence rule or its effect on the few misconduct allegations that survived the trial court's evidentiary ruling in light of the declarations of Landau and Katzer. Apart from general descriptions of the misconduct accusations, they do nothing more than provide footnoted record citations to sections of their supporting declarations that include both the few portions that survived the trial court's evidentiary rulings and the vast majority that were stricken. In place of setting forth and analyzing the Landau and Katzer declarations, they provide a table that purports to describe them, but does so in a manner that is both general and inaccurate. Because they have failed to provide meaningful and intelligible arguments on these issues, we deem them waived and affirm the order denying their new trial motion. (*Luckett v. Keylee* (2007) 147 Cal.App.4th 919, 927, fn. 11.)

We alternatively conclude on the merits that the trial court did not err. As set forth above, Landau's declaration effectively denied or rebutted appellants' remaining misconduct allegations. We therefore defer to the trial court's implied finding that it believed Landau and Katzer and the express finding that no misconduct occurred.[7]

---

[7] Appellants contend that, pursuant to *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 111, the trial court applied the incorrect standard when evaluating their declarations. According to appellants, under *Weathers,* the trial court was supposed to determine whether potential juror bias *could have* occurred that *could have* affected the verdict. Without parsing the issue too finely, we simply note that even *Weathers* held that credibility determinations concerning whether misconduct occurred were for the trial court to make. (*Id.* at p. 106.) In accord with that rule, and the holding in *Donovan, supra,* 167 Cal.App.4th at pages 924-925, the trial court made the credibility call that no misconduct occurred, a finding that we conclude was supported by substantial evidence.

13

5.     *The Attorney's Fee Award Was Proper Under the Alter Ego Doctrine*

Defendants' moved to obtain attorney's fees against Rashti and Rostami under a variety of theories, some based on contract principles, and others related to Article 9 of the Commercial Code. Defendants also claimed that Rashti and Rostami were liable for fees as the alter ego of Dell Canon. The trial court's minute order awarding defendants their attorney's fees states only that it did so for the reasons set forth in defendants' moving papers. The appellate record does not include a transcript of that hearing. As a result, we presume the trial court awarded fees at a minimum under the alter ego theory. (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186-187 [in absence of reported proceedings, we presume the trial court's order is correct, and prejudicial error must be affirmatively shown].)[8]

Code of Civil Procedure section 187 grants the courts the power to carry their jurisdiction into effect, including the amendment of judgments to add an alter ego of the original judgment debtor. (*Highland Springs Conference and Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 280 (*Highland Springs*).) This is an equitable theory based on the concept that the court is merely inserting the correct name of the real defendant. (*Ibid.*)

---

[8]     Appellants complain that the defendants did not raise the alter ego theory and that the trial court did not rest its finding on that theory. The record shows that the issue was expressly raised in defendants' attorney's fee motion as a separately headed argument section that was supported by discussion and analysis, along with a supporting declaration by defendants' counsel and accompanying evidence. At oral argument, counsel for Rashti and Dell Canon cited *People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1521-1523, for the proposition that the trial court's failure to make express findings somehow works in their favor. That case concerns the trial court's discretionary authority to dismiss allegations in criminal cases, but does cite the general proposition upon which we rely: that in the face of a silent record, we presume no error occurred.

Because we conclude that attorney's fees were properly awarded under the implied finding of alter ego, we need not reach the several other theories advanced by defendants, or Rashti and Rostami's contention that the fee award should have been allocated based on their brief time in the action as parties.

14

Although such an amended judgment requires a noticed motion, an evidentiary hearing is not required and the trial court may rule based on the declarations and other written evidence. (*Highland Springs, supra,* 244 Cal.App.4th at p. 280.) The moving party must show by a preponderance of the evidence that: (1) the parties to be added as judgment debtors had control of the underlying litigation and were virtually represented at trial; (2) the separation between the new parties and the corporate entity no longer exists because there is a unity of interest and ownership between them; and (3) if the debt were to be limited to the corporate entity, an inequitable result will occur. (*Ibid.*)

We review the trial court's order under the abuse of discretion standard and will not reverse so long as there is a legal basis for the ruling and it is supported by substantial evidence. (*Highland Springs, supra,* 244 Cal.App.4th at p. 280.) Although alter ego is considered an extreme remedy to be sparingly used, application of the doctrine is founded on the notion that justice is to be done. (*Id.* at p. 281.)

The trial court considers several factors when determining whether there is a sufficient unity of interest and ownership. These include the commingling of funds and assets, use of the same office and employees, disregard of corporate formalities, identical officers and directors, the use of the corporate entity as a mere shell or conduit for the others, and inadequate capitalization. No single factor is determinative, and the trial court must consider all the circumstances of the case. (*Highland Springs, supra,* 244 Cal.App.4th at pp. 280-281.)

Appellants' trial court opposition to the fee motion did not address the alter ego issues. On appeal, only Rostami has chosen to address the issue. Although Rostami joined in the appellate arguments of Rashti and Dell Canon, Rashti and Dell Canon have not joined in Rostami's appellate arguments. Accordingly, they have waived the issue. We therefore proceed to consider the issue as to Rostami.

Rostami's first challenge to the fee order is a procedural one: defendants brought their motion to amend before the judgment was entered, and, in the alternative, should have asserted their alter ego claim before trial because they knew about the issue ahead of time. As to the former, we see no harm from the trial court's apparently premature

consideration of the motion, which appellants were free to challenge on that basis. Their failure to do so amounts to a waiver of the supposed procedural defect. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-265 [waiver of procedural irregularities by failure to timely object].) As to the latter, Rostami cites decisions concerning a *plaintiff's* obligation to name a supposed alter ego as a party defendant in a timely manner. (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486; *Jines v. Abarbanel* (1978) 77 Cal.App.3d 702.) We fail to see how a *defendant* can assert an alter ego claim for attorney's fees before trial. In any event, the principle is not mandatory, and at best stands for the proposition that a plaintiff probably should allege an alter ego claim in its complaint. (*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 817 (*Relentless*).)[9]

Before turning to Rostami's evidentiary challenges to the alter ego finding, we note again that Rostami and Rashti did not contest that issue when opposing defendants' attorney's fee motion. We therefore limit our review to the evidence that was before the trial court. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405 [appellate review is generally confined to the record that was before the trial court].)

The evidence showed that Dell Canon was formed for the sole purpose of buying All Century's bundle of notes from Comerica and had no other assets. It had no employees. Rashti and Rostami did not observe any of the usual corporate formalities, including meetings, taking minutes, or filing documents with the Secretary of State. All Dell Canon expenses were paid by Rostami, while Rashti actually managed the business. In return, she was to receive 50 percent of any profits. Rashti could not recall whether Dell Canon had its own bank accounts, but she did recall that Rostami funded the purchase of the Comerica note bundle, along with Dell Canon's other expenses, from his personal business account. In addition, Rostami paid the legal fees of a man named

---

**9** At oral argument, counsel for Rashti and Dell Canon contended that no section 187 motion had been made. Once more, the record shows otherwise. Although defendants' attorney's fee motion was not entitled a motion under section 187, the motion expressly raised section 187 as the underlying authority for imposing alter ego liability.

16

Beroukim, who served as Dell Canon's lawyer for day to day operations and who also represented Dell Canon in this action until sometime in 2013.

Without expressly saying so Rostami apparently contends that the failure to observe corporate formalities was irrelevant given the entity's joint ownership and limited activities – buying the bundle of notes and then foreclosing on the properties. He cites no authority, and we are aware of none, that such circumstances excuse compliance with the normal formalities of corporate business. That the corporate assets were held in Dell Canon's name does not in and of itself undermine this conclusion.

Rostami next contends that Dell Canon was properly capitalized because for $1.1 million it was able to buy notes with a potentially far greater combined value, and the fact that the investment did not pay off does not mean the business was not properly funded. We disagree. The evidence showed that the assets were purchased by Rostami with his separate funds, not from funds belonging to Dell Canon. Given the risky nature of Rostami and Rashti's investment, the absence of any operating funds that belonged to Dell Canon suggests that the business was nothing more than a shell to hold risky assets.

Rostami also contends that he did not control the litigation, pointing to Rashti's statement that she made all the business decisions. We disagree. First, Rostami paid the legal fees for Dell Canon's representation before eventual trial counsel Caldwell was hired, leading to the inference that he continued to do so after that time. Second, Dell Canon was fully and vigorously represented throughout the action. Third, there was no showing that anyone other than Rashti and Rostami had the authority to hire lawyers and pay their expenses, or that anyone else was interested in the outcome of the litigation. On this record, we conclude there was substantial evidence that Rostami controlled the litigation. (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1110.)

Finally, Rostami contends there is no evidence of wrongdoing or bad faith by Dell Canon, and that an inequitable result cannot be based solely on defendants' supposed difficulty in enforcing the judgment against Dell Canon. He bases this assertion on two decisions: *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, and

17

*VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.* (2002) 99 Cal.App.4th 228, which cited *Sonora* for that proposition.

At issue in *Sonora Diamond* was the trial court's order denying a motion to quash service of process for lack of personal jurisdiction by a parent corporation being sued as the alter ego of its subsidiary. The plaintiff school district sold a gold mining operation worth $900,000 to Sonora Mining for $6 million: $2 million up front and the rest as an endowment over 20 years. The district knew Sonora Mining was a subsidiary of Sonora Diamond and that approval of the contract was to come from another person. Sonora Mining eventually defaulted, but by that time, the school district had received several times the value of the property. On appeal, the *Sonora Diamond* court held there was no evidence of wrongdoing by either Sonora Mining or Sonora Diamond, and no evidence of injustice from recognizing Sonora Mining's separate corporate identity. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 539.) The court went on to state that "the alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." (*Ibid.*) Because it concluded that there could be no inequitable result, the *Sonora Diamond* court never analyzed whether there had been a sufficient unity of interest between the two corporations.

Based on *Sonora Diamond*, Rostami contends that defendants' inability to satisfy a judgment against Dell Canon alone due to its lack of assets is not an inequitable result for purposes of the alter ego doctrine. We believe that *Sonora Diamond* is distinguishable because the decision in that case rested solely on the defendant's inability to satisfy the judgment.

Here, in addition to evidence showing a nearly complete unity of interest between Rashti/Rostami and Dell Canon, the evidence also showed that the more than $800,000 in net proceeds realized from the foreclosure of the Califa Street property went directly to Rostami. These facts support the inference that Dell Canon was nothing more than an

empty shell and that immunizing Rostami and Rashti from the judgment would produce an inequitable result.[10]

## DISPOSITION

The judgment awarding attorney's fees and costs to defendants is affirmed. Defendants shall recover their costs on appeal.


                                                              RUBIN, ACTING P. J.
WE CONCUR:



        FLIER, J.



        GRIMES, J.

---

**10**      *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc., supra,* 99 Cal.App.4th 228, did no more than cite *Sonora Diamond* without discussion or analysis as part of its general description of the principles applicable to the alter ego doctrine.  (*Id.* at p. 245.)  The *VirtualMagic* court did not reach the issue whether an alter ego finding was proper and instead remanded the matter to the trial court to make the required factual findings.  We therefore conclude that *VirtualMagic* is also inapplicable.